IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CINDY LEANN KING, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | NO. 3:17-cv-01116 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| MONTGOMERY COUNTY, | ) | |
| TENNESSEE, JOHN MATOS, | ) | MAGISTRATE JUDGE HOLMES |
| Individually; JESSICA COOK, | ) | |
| Individually; and JEANETTE | ) | |
| FARRELL, Individually. | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court are five motions for summary judgment: Plaintiff's Motion for Summary Judgment (Doc. No. 143), Defendant Montgomery County, Tennessee's Motion for Summary Judgment (Doc. No. 76), Defendant John Matos's Motion for Summary Judgment (Doc. No. 149), Defendant Jessica Cook's Motion for Summary Judgment (Doc. No. 152), and Defendant Jeannette Farrell's Motion for Summary Judgment (Doc. No. 151).

For the reasons discussed below, Plaintiff's Motion for Summary Judgment is DENIED. The defendants' motions for summary judgment are GRANTED.

## I.    FACTUAL BACKGROUND

### A.  Search and Seizure

In August 2016, Plaintiff Cindy King lived in Clarksville, Tennessee, at 3637 Aurora Drive.[1] (Doc. No. 161-2 at ¶1.)  Plaintiff owned dogs and fostered dogs for animal rescue groups. On August 8, 2016, she was keeping fifteen dogs at the residence on Aurora Drive.  Plaintiff alleges

---
[1] Defendant Matos disputes that Plaintiff lived at the property and only agrees that she was the lessee of the residential property. (Doc. No. 161-2 at ¶ 1.)

she owned nine of the dogs and that she was fostering six dogs for rescue groups.[2] Plaintiff planned to travel to Kentucky on August 8, 2016, to visit her mother, who was having heart surgery, and she arranged for people to care for the dogs while she was away. Ten dogs were taken to stay with Carolyn Will, Honesty Patrick, and Stacey Seery.[3] (Doc. No. 157-4 at 64-66.) Trisha Davids agreed to check on the five dogs left at the house.[4] (*Id.* at 68-70.)

Plaintiff left for Kentucky on the morning of August 8, 2016. (Doc. No. 164 at ¶12.) On her way, Plaintiff was stopped for speeding in Ohio County, Kentucky, and was taken into custody on an outstanding bench warrant. (*Id.* at ¶13.) Carolyn Will says that Plaintiff called her after the arrest, very upset and crying and told her that she had been arrested in Kentucky and "somebody needs to check on the dogs at my house." (Doc. No. 157-7 at ¶5.) Ms. Will says that Plaintiff asked her to call Trisha Davids about the dogs. (*Id.*) Ms. Will stated that she believed she was being asked to make sure the dogs were being cared for and that she had permission to check on the dogs in the house if needed. (*Id.*) After Plaintiff's arrest, Ms. Davids also spoke with her about the dogs. (Doc. No. 149-9 at 3.) Ms. Davids told Plaintiff that she would be unable to check on the dogs and asked if it was ok for Carolyn Will to check on the dogs instead. (*Id.*) Ms. Will and Ms. Davids then spoke by telephone about the care of the dogs and Ms. Will agreed that she would

---

[2] In response to the Court's request, and to clarify questions of ownership, Plaintiff submitted a list of dogs that she claims to have owned on August 8, 2016. (Doc. No. 231.) For purposes of the pending motions, the Court assumes Plaintiff owned the nine dogs listed: Oscar (Pitbull), Journey (Rotweiller/Shar-Pei mix), Lotus (Shar-Pei, blind and deaf), Rex (Miniature Pinscher), Gracie (Shar-Pei), Layla (Great Pyrenees), Olay (Shar-Pei), Kayvee (Shar-Pei), and Roscoe (Shar-Pei).

[3] Of the ten dogs taken to stay with others, Plaintiff owned the two dogs kept by Honesty Patrick and four of the five dogs kept by Carolyn Will. (Doc. No. 231; Doc. No. 147-2 pp. 64-65.)

[4] Plaintiff owned three of the dogs left in the house. (Doc. No. 231; Doc. No. 147-2 pp. 64-65.)

go to the house and check on them. (Doc. No. 157-7 at ¶6.)  Ms. Davids gave Ms. Will the address and instructions for entering the house through the back door. (*Id*.)

Ms. Will and her husband went to Plaintiff's house on the evening of August 8.  Ms. Will says that she could smell "a foul odor of feces and urine," as soon as she stepped out of her car. (*Id*. at ¶ 8.)  She stated, "When I opened the back door to the residence, my husband and I immediately gagged, and we recoiled from the pungent smell of decaying feces and urine emanating from inside the residence." (*Id*. at ¶ 9.) They entered the house and saw "complete disarray, with trash and debris lying throughout." (*Id*. at ¶ 10.)  She saw one dog in a cage without access to food or water, one dog that she thought appeared to need medical attention[5], other dogs running around, and "massive amounts of feces and urine scattered throughout the residence, so much so that it was impossible to walk without stepping in feces or urine." *Id*.  Ms. Will took twelve photographs of the conditions in and around the residence and then she called 911. (*Id*.; *See also,* Doc. No. 149-1, Ex. 1.)

Officer John Matos received the 911 dispatch call. (Doc. No. 149-5 at ¶ 2.)  The operator informed him that the 911 caller was dog sitting, that the resident was dog rescuer, that the caller had entered the home to check on the dogs and found it "disgusting" with "feces everywhere," and that the resident was under arrest and in police custody elsewhere. (*Id*.; Doc. No. 149-1, Ex. 1.) When Officer Matos arrived at the residence, Ms. Will and her husband were waiting outside near the driveway. (Doc. No. 149-5 at ¶ 3; Doc. No. 157-7 at ¶ 12.)  Ms. Will told Officer Matos that she and her husband had been inside the house, that there was at least one dog inside in need of

---

[5] Trisha Davids also testified that one of the dogs had some kind of medical issue and was missing its fur.  (Doc. No. 157-6 at 7.) ("[T]here was one I seen, but – a Chinese Shar-Pei one that was – with no hair and that, but I guess there was a medical issue with that one.")

immediate medical attention, dogs with no access to water[6], no food available to any of the dogs, extensive amounts of animal feces throughout, and a powerful stench of feces and urine throughout the residence. (*Id*.)  Ms. Will told Officer Matos that she was caring for Plaintiff's dogs and that she had permission to enter the residence and that Plaintiff was arrested and incarcerated in Kentucky. (*Id*. at ¶¶ 3-4; Doc. No. 157-7 at ¶ 13.)  Officer Matos testified he could smell the odor of ammonia, which he associated with feces and urine, from outside the house, and the smell grew stronger as he approached the house. (Doc. No. 146-6 at 27; Doc. No. 149-5 at ¶7.)

Ms. Will then led Officer Matos to the back of the house and opened the unlocked back door.  (Doc. No. 149-5 at ¶ 9; Doc. No. 157-7 at ¶ 7.)  From outside the door, Officer Matos smelled the "overpowering" odor of ammonia coming from within the residence.  (Doc. No. 149-5 at ¶ 9.)[7]  Through the doorway he observed a caged dog without food or water, two loose dogs, a half-empty water bowl, and a large amount of trash and debris he believed posed an immediate threat to the health, safety, and well-being of the dogs inside the house. (*Id*.)

Officer Matos then entered the house and found it was full of trash and debris, and covered in feces and urine. (*Id*. at ¶¶11-12.)  He stated that the ammonia odor was so strong that he had trouble breathing and his throat, nose, and eyes burned. (*Id*. at ¶ 11.)  He observed some dogs in cages and some dogs roaming free in the house. (*Id*. at ¶ 12.)  He found one dog trapped in an upstairs bonus room that was "absolutely covered" in feces. (*Id*.)  He observed there was no food available or accessible to the dog and that several of the dogs were without access to water. (*Id*.)

---

[6] Plaintiff testified she did not leave any water available to some of the dogs when she left for Kentucky. (Doc. No. 158-1 at 13.)

[7] Even Plaintiff agreed there was a strong smell of urine in the house. (Doc. No. 169 at ¶ 10; Doc. No. 158-1 at 10.)

The refrigerator was full of cockroaches. (*Id.* at 13.) Officer Matos took five photographs of the interior of the house, for his investigation report. (*Id.* at ¶ 16; *Id.* at Ex. 2.)

Officer Matos contacted his supervisor and explained his observations, and his supervisor told him to contact Montgomery County Animal Control. (Doc. No. 149-6 at 14.) Jessica Cook, an animal control officer with Montgomery County Animal Control ("MCAC"), received the call from Officer Matos. (Doc. No. 157-3 at ¶ 6-8; Doc. No. 157-1 at 31-32.) She went to the residence and met Carolyn Will and Officer Matos. (Doc. No. 153-7 at ¶ 12-15.) Officer Matos told Officer Cook that Ms. Will was a pet-sitter and Plaintiff was incarcerated in Kentucky; he also conveyed his observations of the condition of the residence and the dogs inside. (*Id.*) Ms. Will let Officer Cook into the house to do a welfare check of the dogs. (*Id.* at 38.) Officer Cook observed the condition of the house and called her supervisor, Jeanette Farrell, Director of MCAC. (*Id.* at 39.) Director Farrell instructed her to take photos of the dogs and the condition of the house. (*Id.*) Officer Cook texted the photos to Director Farrell. (Doc. No. 158-6 at ¶ 4.)

After viewing the conditions in the house, Officer Cook determined the amount of feces and urine present in the residence created a biohazard environment for the dogs and that continued exposure could result in illness or death. (Doc. No. 157-3 at ¶¶ 17-19.) Additionally, Officer Cook stated concerns that some of the dogs needed medical care: many of the dogs had very long nails, one had a skin condition, and another was believed to have a bad ear infection. (Doc. No. 157-3 at ¶ 37 (Cook Decl.).) Ultimately, none of the dogs recevied emergency veterinary care. (Doc. No. 157-1 at 57 (Cook Depo.).)

While Officer Cook was still at the house collecting the dogs, Trisha Davids arrived to "check on things." (Doc. No. 157-3 at ¶ 34; Doc. No. 157-6 at 2.) She helped Officer Cook and Ms. Wills round up the remaining dogs. (Doc. No. 157-6 at 3.)

Upon leaving the residence, Officer Cook left a notice on the front door. (Doc. No. 157-3 at ¶ 38; Doc. No. 175-2.) The notice stated: "An Animal Control Officer visited your home today and found you not at home. A report has been filed with our department regarding your animal(s). Your animal has been taken to the Montgomery County Animal Care and Control (Description: 5 dogs); [Signed and Dated] Cook, August 8, 2016, 11:18." (Doc. No. 175-2.) Officer Cook stated she attempted to contact Plaintiff prior to removing the dogs, but that the phone number she had on file was not working. (Doc. No. 157-3 at ¶¶ 26-27.) Officer Matos stated he did not attempt to call Plaintiff that evening because she was incarcerated. (Doc. No. 149-6 at 20.)

The next morning, on August 9, 2016, Honesty Patrick and Carolyn Will surrendered the seven dogs in their care to MCAC. (Doc. No. 158-6 at ¶ 9.) That same day MCAC began to locate the owners of the twelve dogs in its care at the time.[8] (Doc. No. 158-6 at ¶ 10.) MCAC determined Oscar[9] was owned by the rescue organization Paw's Angels, and two other dogs, Sheba and Journey,[10] were owned by the rescue organization Chinese Shar-Pei Network ("CSN"). (*Id.*) These three dogs were release to their deemed owners that day.

The following day, August 10, 2016, CSN contacted MCAC about three dogs owned by CSN that were being fostered by Plaintiff, but were not yet in the custody of MCAC. (*Id.*) CSN informed MCAC that it had revoked Plaintiff's volunteer status and asked MCAC for help retrieving three dogs that Plaintiff was fostering. (*Id.* at ¶13.) A MCAC officer went to Plaintiff's residence to retrieve the dogs, but Plaintiff initially refused to surrender them. (*Id.* at ¶14.) Director

---

[8] Ms. Farrell, despite being the director of MCAC, claims she did not personally participate in the identification of owners or the release of dogs to their owners. (Doc. 158-6 at ¶ 7.)

[9] Plaintiff claims ownership of Oscar. (Doc. No. 231.)

[10] Plaintiff claims ownership of Journey. (Doc. No. 231.)

Farrell then went to King's house and asked her to speak by phone with the CSN representative who wanted the dogs returned. (*Id*. at ¶15.) After speaking to the CSN representative, Plaintiff surrendered the three dogs. (*Id*.)

**B. The Photographs**

Photographs of the interior of Plaintiff's home were posted on various social media sites and on the internet news site *Clarksville Now*. Three people are known to have taken photographs of Plaintiff's house: Carolyn Will, Officer Matos, and Officer Cook.

Carolyn Will was the first person to enter Plaintiff's house on August 8. She took twelve photographs of the interior and exterior of the house using her husband's cell phone. (Doc. 157-7 at ¶ 9; Doc. No. 158-7 at ¶ 2.) She photographed a dog laying in a room in which the floor is covered in feces. (Doc. No. 158-7 at ¶ 3.) Ms. Will states that she shared this photo with three individuals who were administrators of local pet pages on Facebook. (*Id*.) Ms. Will identified the photo published on *Clarksville Now* on August 25, 2016, as the photo she took. (*Id*. at ¶ 4.)

Officer Matos took five photographs of the interior of Plaintiffs home as a part of the investigation. (Doc. No. 149-5 at ¶ 16.) Officer Matos attached these photographs to his investigative report and states he "never at any time, circulated, shared, posted, or otherwise distributed any of the [] investigative photographs to anyone." (*Id*.)

Officer Cook was instructed by her supervisor, Jeannette Farrell, to take photographs of the conditions inside Plaintiff's residence for MCAC records. (Doc. No. 157-3 at ¶ 31.) She sent some of the photographs to Director Farrell, but stated she did not share the photographs with anyone outside of MCAC. (*Id*. at ¶¶ 32, 41-43.)

On August 9, Director Farrell shared two of the photographs taken by Officer Cook with Linda Smith, a former MCAC volunteer and the administrator of several local pet pages on

Facebook, ostensibly so Ms. Smith could "keep an eye out for any information regarding the case" and remove photos of Plaintiff's home if they were posted. (Doc. 158-5 at ¶¶ 2-4.) Photos were shared on Facebook by Honesty Patrick and others. (*Id*. at ¶¶ 5-6.) Although the photos and posts were removed when possible, some people in the group took screenshots and began posting the photos to other sites. (*Id*. at ¶ 8.) Ms. Smith states the photos shared on social media were not the same photos sent to her by Director Farrell and she did not share the photographs provided to her. (*Id*. at ¶ 9.)

### C. The Criminal Charges and the Security Bond

On August 19, 2016, Officer Cook submitted an Affidavit of Complaint for animal cruelty. The judicial commissioner found probable cause for five counts of animal cruelty pursuant to T.C.A. § 39-14-202, and for an arrest warrant to issue against Plaintiff. (*Id*. at Ex. K.)

Officer Cook sought a security bond to pay for the care of the dogs under Tenn. Code Ann. § 39-14-210(g)(2). At that time, MCAC had possession of eight of the dogs. (Farrell Decl. ¶ 19.) MCAC initially asked for a $20,000 security bond, but the amount was reduced by the circuit court to $10,000, in part because the bond applied only to the dogs that were the subject of the criminal animal cruelty charges. (*See* Doc. No. 45, Ex. 4.)

King did not pay the $10,000 security bond, and the dogs that were the subject of the criminal charges were forfeited to MCAC pursuant to T.C.A. § 39-14-210. The animal cruelty charges were dismissed on July 26, 2017. (Doc. No. 45, Ex. 6.) At this time, MCAC still held five of Plaintiff's dogs. Director Farrell initially told Plaintiff the dogs would not be released to her until she paid $44,008.61 in charges related to the care and boarding of the dogs. (Doc. No. 45, Ex. 8.) Following the filing of this case, Montgomery County and King reached an agreement, and the dogs were released to King on November 21, 2017. (Doc. No. 174-1 at ¶ 14.)

Plaintiff filed this action against Montgomery County, Tennessee, and against the individuals Officer John Matos, Officer Jessica Cook, and Montgomery County Animal Control Director Jeanette Farrell. She claims violations of her Fourth and Fourteenth Amendment Rights arising from unreasonable search and seizure and violations of procedural and substantive due process. Her request for a judgement declaring Tenn. Code Ann. § 34-14-210(g)(2) unconstitutional was previously denied by the Court on a motion for partial summary judgment. (Doc. No. 116.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of

evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers*, 344 F.3d at 595. Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). The judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.

In ruling on a motion for summary judgment, "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). In determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely only upon those portions of the verified pleadings, depositions, and answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## III. ANALYSIS

### A. Fourth Amendment – Search and Seizure

#### 1. Search of Residence and Seizure of Dogs on August 8

Plaintiff complains that the warrantless search of her residence and the subsequent seizure of five dogs from her residence was unreasonable and in violation of the Fourth Amendment. She argues the officers did not have a warrant to enter her residence, she did not give consent, no third party was authorized to give consent on her behalf, and circumstances did not justify the warrantless search of her residence. The Defendants argue they were justified in entering the King

residence and seizing the dogs because of concern for the health and safety of the dogs and because they had probable cause to believe the dogs were associated with criminal animal cruelty.

The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The Supreme Court, in *Payton v. New York*, stated that while warrantless entry into a home is "presumptively unreasonable," there are times that "exigent circumstances" will justify a warrantless entry. 445 U.S. 573, 583-86 (1980). *See also*, *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978) ("[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.") Under the exigent circumstances exception to the warrant requirement, there must be a "need for prompt action by government personnel, and [a conclusion] that delay to secure a warrant would be unacceptable under the circumstances." *United States v. Rohrig*, 98 F.3d 1506, 1517 (6th Cir. 1996).

Although most commonly invoked in emergencies involving the health and safety of people, the Sixth Circuit has held that the exigent circumstances exception to the warrant requirement also applies to circumstances affecting the health and well-being of animals. *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 490 (6th Cir. 2014). In *United Pet Supply*, the Sixth Circuit held where "squalid" and unsafe "conditions created … an imminent and ongoing danger to the health of the animals," the doctrine of exigent circumstances applies. *Id.* In *United Pet Supply*, the court upheld a warrantless seizure of animals when the investigators reasonably

believed they were faced with an emergency regarding the health and safety of animals because the store was hot (the air conditioner had been broken for weeks), some of the animals were without food or water, and the animals had feces and urine matted in their fur. *Id*. at 487. The Sixth Circuit concluded the warrant exception for exigent circumstances applied to the seizure of the animals from the store because the conditions in the store created an imminent and ongoing danger to the health of the animals. *Id*. at 491.

As always, reasonableness is the touchstone of Fourth Amendment analysis. In determining whether exigent circumstances justify the warrantless entry into a residence or the warrantless seizure of property, the court must evaluate whether "an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 n.1 (6th Cir. 2013) (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). The determination of exigent circumstances is normally a question for the jury, unless a finder of fact could reach but one conclusion as to the existence of exigent circumstances as a matter of law. *Ewolski*, 287 F.3d at 501. The burden is on the government to "demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

The Court finds that exigent circumstances confronted Officer Matos the evening of August 8, 2016, and justified his entry into Plaintiff's residence. Officer Matos went to Plaintiff's residence in response to a 911 call.[11] The 911 operator informed him the caller was dog sitting, the resident was dog rescuer, the caller had entered the home to check on the dogs and found it

---

[11] Although not dispositive, courts have found a "call to emergency services highly relevant to the issue of exigency. *Smith v. City of Wyoming*, 821 F.3d 697, 712 (6th Cir. 2016) ("The 911 system is intended to give callers a way to obtain help expeditiously, and [the callers'] use of the system reflects their belief that they needed immediate help.")

"disgusting" with "feces everywhere," and the resident was under arrest and in police custody elsewhere. When Officer Matos arrived at the residence, he met the caller, Carolyn Will, and her husband outside the house. Ms. Will showed Officer Matos pictures of the interior and told him that there were dogs inside without access to food or water, she believed at least one of the dogs required medical attention, and the condition of the interior of the house was so foul that for the animals to remain inside the house would be harmful to their health. She also told Officer Matos that the house's occupant, Plaintiff Cindy King, was in jail and she did not know when she would return to care for the dogs or attend to the house. Officer Matos stated he could smell ammonia from urine while standing in the driveway outside the house and that the smell became stronger as he approached the house. Ms. Will opened the back door to the house, which was unlocked, and Officer Matos could see inside. He observed crated dogs, a house in complete disarray, and, importantly, he could smell the foul odor of urine and feces.

At this point, based on what he saw and smelled and based on the information provided by Ms. Will, Officer Matos believed that there were dogs inside the house that were in *immediate* need of assistance and he was justified in entering the house without a warrant. The Court finds that based on the information before him at the time, this conclusion was reasonable, and Officer Matos was justified in entering the residence based on exigent circumstances. Officer Cook was also justified in entering the residence based on her observations and her understanding of the conditions as described by Officer Matos.

Exigent circumstances can also justify the seizure of animals from an unhealthy environment. *United Pet Supply,* 768 F.3d at 490. *See also*, *Lowery v. Faires*, 57 F. Supp. 2d 483, 493 (E.D. Tenn. 1998) (seizure of cattle); *Mallory v. City of Riverside*, 35 F. Supp. 3d 910 (S.D.

Ohio 2014) (seizure of chickens). Montgomery County Animal Control Regulations also call for the seizure of animals in such circumstances:

> (a) In addition to any other remedies provided in these Regulations, an Animal Control Officer or a law enforcement officer may seize, impound and humanely confine to an animal shelter or hospital any of the following animals:
> (iv)    Any unattended animal that is ill, injured, or otherwise in need of care;
> (v)    Any animal that is reasonably believed to have been abused or neglected;
> (vi)    Any animal that is considered unattended or abandoned, as in situations where the owner is deceased, has been arrested or evicted from his regular place of residence. (Doc. No. 158-6 at 9-22.)

Officer Cook determined the amount of feces and urine present in the residence created a biohazard environment for the dogs and that continued exposure could result in illness or death and she determined to remove the dogs from the property.[12] The law does not require that Officer Cook's assessment be proven correct, only that it be reasonable. It should be noted that even Plaintiff's expert veterinarian, having reviewed the photos of the house, testified that the conditions in the house could be dangerous to humans or dogs after exposure of just a few hours.[13] (Doc. No. 174-4, at 19-45.)

---

[12] Witness have also noted that some of the dogs had no access to food or water. Plaintiff admits she left some of the dogs without water (Doc. No. 158-1 at 13), but asserts she had arranged for someone to come over and feed and water the dogs and had they done so, or even if the animal control officer had done so, food and water would not have been an issue. Based on the evidence presented on these motions, the Court finds the condition of the house itself, and not the lack of food and water (which could have been remedied in the short term) justified removal of the dogs from the house.

[13] Q: And the conditions depicted in these photos would not be a suitable environment for dogs to live in?
A: [David T. Wilder, DVM]: No. Deplorable under any circumstances. (Doc. No. 174-4 at 19.)
Q: Well, isn't it true that the conditions of plaintiff's home could be dangerous to humans or dogs even if just exposed for a day.
A: Yeah.
Q: Or even just a few hours?
A: Yes, could be.
Q: And contact with dog feces can pose health concerns to both dogs and humans?
A: That's right. Yeah. (*Id.* at 21.)

Plaintiff objects to the assessment that the conditions in the house were bad enough to require removal of the animals and notes that none of the animals received emergency veterinary care immediately after being taken from her house or even within the first few days. She does however concede that the dogs had "really long nails," that one of the dogs had a bad skin condition, that some of the dogs smelled "yeasty," and one of the dogs was believed to have a bad ear infection. (Doc. No. 171 at ¶ 73.)

Defendants Officer Matos and Officer Cook also argue that they were justified in seizing the dogs because they had probable cause to believe the dogs were associated with a crime. An officer may seize property when there is probable cause to associate the property with criminal activity. *See Mallory*, 35 F.Supp. 3d at 932 (citing *Payton v. New York*, 445 U.S. 573, 587 (1980)).

The Supreme Court has defined probable cause as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Probable cause requires only the probability of criminal activity, not some type of prima facie showing. *Illinois v. Gates*, 462 U.S. 213, 235 (1983). A probable cause determination, even if wrong, is not actionable as long as the determination passes the test of reasonableness. *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993). Reasonableness is a question of law for the court. *Hunter v. Bryant*, 502 U.S. 224 (1991). "It has been long settled that the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006).

---

Q: And so that would be reasonable, for [Office Matos] to be concerned that that – those conditions were an immediate threat to the dogs inside?
A: I can see where he would assume that. (*Id*. at 45.)

In determining the validity of a warrantless seizure based on probable cause, it must first be established that the officer was lawfully in the place from which the evidence could be viewed. Once this has been satisfied, seizure is justified only when the incriminating character of the property in question is immediately apparent. *Horton v. California*, 496 U.S. 128, 136 (1990). The Court uses the relevant factors articulated by the Sixth Circuit in *United States v. Mathis*, to determine whether the incriminating nature of the property was "immediately apparent:" (1) whether the intrinsic nature or appearance of the item gives probable cause to believe it is associated with criminal activity, (2) whether the officers, at the time of discovery of the item and with the facts then available, can determine probable cause of the items incriminating nature, and (3) whether the officer can recognize the nature of the item as a result of his "instantaneous sensory perception." *United States v. Mathis*, 738 F.3d 719, 732.

The officers claim they had a reasonable belief that the dogs were victims of cruelty to animals in violation of Tennessee criminal code. Tenn. Code Ann. § 39-14-202 states that "a person commits the offense of cruelty to animals if intentionally or knowingly fails to provide necessary food, water, care or shelter," and that, "upon seizure by law enforcement, custody of any animal victimized under this part shall be placed with any governmental animal control agency, law enforcement agency, or their designee. The governmental animal control agency … shall assist the animal and preserve evidence for prosecution."

Here, the officers had been called by an emergency call to check on the welfare of animals at the residence. Once at the property, their observations, including their "instantaneous sensory perception," caused them to be concerned about the health and welfare of the dogs inside and to enter the residence. The conditions inside the residence gave the officers probable cause to believe that Plaintiff had committed the offense of cruelty to animals under Section 39-14-202 and to seize

the dogs. *See e.g.*, *Mallory*, 35 F.Supp. 3d at 932 (seizure of chickens believed to be used for illegal cockfighting).

For these reasons, the Court finds Officer Matos and Officer Cook were justified in entering Plaintiff's residence on August 8 and in seizing the dogs kept there in squalid conditions.

### 2. Seizure of Dogs on August 9 and 10

Plaintiff contends that on August 9, 2016, MCAC seized seven dogs that were boarded with Honesty Patrick and Carolyn Will and that the following day MCAC seized and impounded three more dogs from Plaintiff's house. Defendants argue that these ten dogs were voluntarily surrendered to MCAC, not "seized," and that Plaintiff, therefore does not allege a Fouth Amendment claim.

Honesty Patrick and Carolyn Will have stated they voluntarily surrendered seven dogs to MCAC and Plaintiff has agreed. (Doc. No. 169 at ¶ 26.) The remaining three dogs were also surrendered, not "seized." Plaintiff agrees with Director Farrell's basic description of the events surrounding the surrender of these dogs. (Doc. No. 169 at ¶¶ 43-50.) After learning that other dogs had been removed from Plaintiff's residence due to concerns about their health and safety, the rescue organization CSN notified Plaintiff that it was revoking her volunteer status. (Doc. No. 158-6 at ¶ 13.) CSN asked MCAC for help retrieving the three CSN dogs in Plaintiff's care. Although she initially refused, upon speaking to a CSN representative, Plaintiff voluntarily surrendered the dogs. (*Id*. at ¶ 14-15.) The fact that Director Farrell came to Plaintiff's house to ask her to surrender the dogs, does not create a "seizure."

Because these ten dogs were not "seized," Plaintiff has not stated violation of the Fourth Amendment as to these dogs.

**B. Fourteenth Amendment – Due Process**

Plaintiff alleges a violation of due process guaranteed by the Fourteenth Amendment because she was not provided procedural due process with regard to the seizure and impoundment of her dogs. She claims the written notice left on her door by Animal Control Officer Cook was inadequate because its delivery was not by one of the methods required by the MCAC regulations (telephone or certified mail) and it did not state why the dogs had been impounded or how they could be reclaimed. (Doc. No. 144 at 20-21.) Plaintiff also claims a due process violation for failure to hold either a pre-deprivation hearing or a post-deprivation hearing on the impoundment of the dogs. (*Id*. at 21.) She argues that the MCAC regulations are unconstitutional because they do not establish a procedure to contest ownership determinations before the animals are released, and she was not afforded adequate process with regard to the security bond ordered by the Circuit Court. (*Id*. at 24.)

The fundamental requirement of due process is notice and the opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). To establish a procedural due process claim, a plaintiff must show that (1) she had a life, liberty, or property interest protected by the Due Process Clause; (2) she was deprived of this protected interest; (3) the state did not afford her adequate procedural rights prior to depriving her of the property interest. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009).

To satisfy the first element, Plaintiff must establish that she has a property interest protected by the Due Process Clause. "[T]here can be no dispute that an animal owner has a substantial interest in maintaining his rights in a seized animal … Animal owners [] have a substantial interest in their 'mere' pets." *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 733 (6th Cir. 2011) (quoting *Siebert v. Severino*, 256 F.3d 648, 660 (7th Cir. 2001)). Defendants do not dispute

that Plaintiff has a property interest the dogs that she owns. Indeed, Plaintiff's property interest does not extend to property she does not own. *See Mostek v. Genesee Cty. Animal Control*, 2012 WL 683430 at *4 (E.D. Mich. 2012) ("Because Plaintiff has disclaimed ownership of the cat, [the officer] did not violate Plaintiff's property rights by seizing it.")

Although Plaintiff only alleges ownership of eight dogs in the First Amended Complaint (Doc. No. 45 at ¶23), she has since claimed that she owned nine of the dogs (Doc. No. 231). For purposes of the motions for summary judgment, the Court will assume that Plaintiff owned the nine dogs she listed in the "List of Dogs Owned by Cindy King on August 8, 2016" (Doc. No. 231) and will consider whether Plaintiff was afforded due process with regard to the seizure and impoundment of these dogs.

The remaining element of the due process claim is whether, given the property interest at stake, Plaintiff was afforded the procedural protections she was due. The Court applies the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine if due process was afforded, and consider: "the private interest that will be affected by the official action, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and the Government's interest, including the function involved and the fiscal or administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

Usually due process requires a hearing before the deprivation of property. *See Zinermon v. Bush*, 494 U.S. 113, 127 (1990). However, the Supreme Court has held that pre-deprivation process is only required in cases where such process is feasible: "[t]he controlling inquiry [into whether predeprivation process must be provided] is solely whether the state is in a position to provide for predeprivation process." *Hudson v. Palmer*, 468 U.S. 517, 534 (1984); *see also Parratt*

*v. Taylor*, 451 U.S. 527, 539 (1981) (overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986)). "When the situation necessitates 'quick action' by the state … or meaningful predeprivation process is impracticable, the persons acting under state authority may proceed without violating the property owner's rights so long as the state provides an adequate postdeprivation procedure." *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994). Post-deprivation procedure satisfies the "fundamental requirement of due process" if it provides an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id*. In summary, due process is not violated by the failure to hold a pre-deprivation hearing when a pre-deprivation hearing is impracticable under the circumstances and there is an adequate post-deprivation procedure.

Adequate state remedies can satisfy post-deprivation due process. In *Parratt*, the Supreme Court held that when the deprivation is not the result of some established state policy or procedure, but it unpredictable or random, the requirements of due process can be satisfied when there is "some meaningful means by which to assess the propriety of the State's action at some time after the original taking." *Parratt*, 451 U.S. at 537-44 (holding that plaintiff's post-deprivation remedy was in state court where he could be compensated for the value of his lost property.)

The *Parratt* doctrine requires dismissal of procedural due process claims when the state provides an adequate post-deprivation remedy if: "1) the deprivation was unpredictable or 'random'; 2) predeprivation process was impossible or impracticable; and 3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Zinermon v. Bush*, 494 U.S. 113, 136-139 (1990)).

Cases examining *Parratt*, have held that when government officials are accused of wrongfully withholding property in contravention of established procedure, the plaintiffs did not state a claim under the Fourteenth Amendment because they had a state law remedy to regain their property. *See Copeland*, 57 F.3d at 479 (when prison officials wrongfully withheld $50 from plaintiff's prison account, plaintiff's remedy was a civil action under state law); *Vicory v. Walton*, 721 F.2d 1062, 1064 (6th Cir. 1983) (when a sheriff unlawfully retained possession of his trailer after the conclusion of a criminal proceeding, Plaintiff's remedy was in state court as an action for return of property wrongfully withheld, not a federal due process claim).

To satisfy due process, state remedies need not provide the same relief as an action under Section 1983. "[T]hat [the plaintiff] might not be able to recover under [state] remedies the full amount which he might receive in a § 1983 action is not, as we have said, determinative of the adequacy of state remedies." *Hudson v. Palmer*, 468 U.S. 517, 535 (1984). "It is up to plaintiffs to demonstrate that there are no state remedies available." *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 716 (6th Cir. 1989).

1. **Due process regarding the dogs seized on August 8 that became the subject of the criminal charges**

   a. **Notice**

Upon leaving Plaintiff's residence on August 8, 2016, Officer Cook left a notice on the front door. (Doc. No. 157-3 at ¶ 38; Doc. No. 175-2.) The notice stated: "An Animal Control Officer visited your home today and found you not at home. A report has been filed with our department regarding your animal(s). Your animal has been taken to the Montgomery County Animal Care and Control (Description: 5 dogs); [Signed and Dated] Cook, August 8, 2016, 11:18." (Doc. No. 175-2.)

The next day, while driving back to Clarksville from Kentucky, Plaintiff received a call from someone from the Clarksville police department about the dogs and learned that if she needed any information about the dogs, she should ask MCAC. (Doc. No. 147-2 at 20.) Upon return to Clarksville, Plaintiff went to the animal shelter, where she was told nothing except that "an investigation was pending." On August 19, 2016, eleven days after the seizure of the five dogs from Plaintiff's residence, Officer Cook filed an affidavit of complaint and arrest warrant for Plaintiff, alleging five counts of animal cruelty. (Doc. No. 158-6 at 65-66.) A hearing was held on October 20, 2016. (Doc. 45, Ex. 3.) Ultimately, Plaintiff was indicted on ten counts of animal cruelty.

Plaintiff claims that the notice left on her door and the phone call from the Clarksville police were inadequate to satisfy the notice requirement of due process. Plaintiff cites to Defendants' non-compliance with the Montgomery County Animal Control Regulations (05-3-6), which require the following notice to owner: "Upon impoundment of an animal, the Department of Animal Control shall immediately attempt to notify the owner by telephone or certified mail. Any notice to the owner shall also include the location of the shelter [or] hospital where the animal is confined, hours during which the animal can be reclaimed, and fees to be charged to the owner."

She also claims support from the Sixth Circuit decision in *O'Neill v. Louisville/Jefferson County Metro*, 662 F.3d 723, 734 (6th Cir. 2011). In *O'Neill*, the Sixth Circuit held that animal owners whose dogs were seized from their home on allegations of violating city ordinances were entitled to notice reasonably calculated to apprise them of the allegations against them and of the procedures available to present their objections. *Id*. In *O'Neill* the court held Plaintiffs had not violated any ordinances and that the officers, therefore, had "no legitimate basis" for impounding

the dogs. The court stated that even if the impoundment had been legal, the failure of animal services to provide proper notice of the alleged violation was a violation of due process. *Id.* at 732.

Defendants argue that the notice given to Plaintiff was adequate in the context of a criminal investigation and that, in any event, only modest process is required. (Doc. No. 155 at 22 (citing *Hardrick v. City of Detroit*, 2016 WL 6600039 at *12 (E.D. Mich. 2016))). Defendants argue that, in addition to the notice left at Plaintiff's residence informing her of the whereabouts of the dogs, Plaintiff received a phone call from the Clarksville police the day she was released from jail, and she had actual notice of the criminal investigation against her.

The Court finds neither *Hardrick* nor *O'Neill* entirely applicable. In *Hardrick*, the court held that when animal control temporarily held dogs pending the payment of vaccination and licensing fees, due process did not require the issuance of a formal citation. *Id.* at *12.[14] The *Hardrick* court relied, in part, upon cases holding that the temporary seizure of a dog required minimal due process. *Id.* (citing *Skinner v. Chapman*, 326 F.Supp.2d 431 (W.D.N.Y. 2004) (holding a dog for a 10-day rabies check when the owners knew who seized the dogs and where it would be confined did not violate due process) and *Wall v. City of Brookfield*, 406 F.3d 458 (7th Cir. 2005) (temporary 60-day deprivation of property of slight value (in this case a Doberman Pinscher) requires only slight process.))

*O'Neill* and *Hardrick* are both cases where the dogs were seized on grounds of violating local ordinances. They are not comparable to Plaintiff's circumstance where she was charged with animal cruelty under state criminal law. The due process required in this circumstance is the due process required under the Fourth Amendment to those charged with a crime.

---

[14] On appeal the Sixth Circuit affirmed the due process claim on different grounds, holding that the plaintiffs did not show that the state offers no statutory or common law remedy to their claim. *Hardrick v. City of Detroit*, Mich., 876 F.3d 238 (2017).

MCAC filed a complaint of criminal animal cruelty against King on August 19, 2016, eleven days after the five dogs were seized from her residence. The Tennessee criminal statute on animal cruelty allows impoundment in connection with an animal cruelty investigation. *See* Tenn. Code Ann. § 39-14-210(f) ("Upon seizure by law enforcement, custody of any animal victimized under this part shall be placed with any governmental animal control agency, law enforcement agency, or their designee. The governmental animal control agency … shall assist and preserve evidence for prosecution.")

In the context of a criminal animal cruelty investigation, the notice provided to Plaintiff alerting her to the whereabouts of her dogs was sufficient for the time between the impoundment of the dogs and when criminal charges were noticed and that thereafter the criminal proceedings provided the necessary due process.[15]

### b. Hearing

A pre-deprivation hearing is not required when the circumstances necessitate "quick action." *See generally, Hudson*, 468 U.S. at 534; *Parratt*, 451 U.S. at 539; *Harris*, 20 F.3d at 1401. Officer Cook impounded the dogs out of concern for their immediate health and safety and she did so in accord with Montgomery County Animal Control Regulations that allow for the impoundment of animals that are: "injured or otherwise in need of care; [or] reasonably believed to have been abused or neglected; [or] … [a]ny animal that is considered unattended or abandoned, as in situation where the owner … has been arrested." (Doc. No. 158-6 at 19.)

The Court applies the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine if due process was afforded. First, significant governmental interest existed in the immediate seizure of the animals without pausing for a hearing because of the foul, disgusting,

---

[15] This applies to all dogs seized from King's residence on August 8, 2016, even the dogs over which she does not assert actual ownership.

and unhealthy environment in which the dogs were being kept and because, at the time, King was being held in jail without bond, thus the officers did not know when she would return to rectify the situation in the house. Second, state law and Montgomery County Animal Control Regulations authorize officers to "lawfully intervene to prevent the perpetration of ay act of cruelty upon any animal in that persons presence" (Tenn. Code Ann. § 39-14-210) and authorizes the seizure of animals that are "reasonably believed to be abused or neglected" or "abandoned … as in situations where the owner …has been arrested." (Doc. No. 158-6, Ex. A.) We also note that, as in *United Pet Supply*, the risk of erroneous deprivation was low due to the trained animal-welfare officers in the seizure, and there is little value to additional procedural safeguards. *See United Pet Supply*, 768 F.3d 464, 486-87 (6th Cir. 2014).

Where a pre-deprivation hearing is not practicable, post-deprivation process is required. *See id.* at 486. As to the dogs seized from her residence which were the subject of the criminal complaint, post-deprivation due process was provided by the process in Plaintiff's criminal case. Plaintiff was afforded at least two hearings on the issue of the impoundment of the dogs and the security bond (Doc. No. 45, Ex. 4), and she unsuccessfully challenged the constitutionality of the security bond statute, T.C.A. § 34-14-210, in this case. (*See* Doc. No. 116). *See also*, *O'Kelly v. Russell Tp. Bd. of Trustees*, 675 F. Supp. 389 (N.D. Ohio 1987) (dismissing civil due process claim when Plaintiff was provided all the post-deprivation he was entitled as part of the criminal process).

## 2. Due process regarding the ten dogs surrendered to MCAC

With regard to the ten dogs that were surrendered to MCAC, Plaintiff complains she was deprived of her property interest in these dogs without a hearing to challenge the impoundment of her dogs or the determination of ownership in violation of her right to due process. Defendants argue that the Montgomery County Animal Control Regulations establish a procedure for owners

to reclaim their animals and, in the event the procedure is not followed, adequate state remedies provide the due process to which Plaintiff is entitled.

In evaluating Plaintiff's due process claim with regard to the ten dogs that were surrendered to MCAC, the Court begins by noting the property deprivation, if any, occurred not at the time the dogs were surrendered, but when they were allegedly wrongfully withheld from return to the owner or released to someone who was not the true owner. Of the ten dogs that were surrendered to MCAC on August 9 and 10, Plaintiff claims to own six of the dogs: Gracie, Layla, Olay, Kayvee, Roscoe, and Oscar. (Doc. No. 231.) MCAC determined that Oscar was owned by the rescue group Paws Angels and released him to Paws Angels on August 9, the same day he was surrendered. The other dogs were held by MCAC until they were returned to Plaintiff in November 2017.

The *Parratt* doctrine is directly applicable here. The Montgomery County Animal Control Regulations apply to the impoundment and return of dogs held by MCAC that were not the subject of the criminal complaint. The Regulations direct the animal control agency to notify the owner and require the owner pay certain fees prior to reclaiming the animal. *See* Montgomery County Animal Control Regulations (Doc. No. 158-6, Ex. A). Plaintiff has not provided evidence she attempted to redeem the dogs once it was established that these dogs were not the subject of the criminal complaint, and MCAC refused to release them. However, if MCAC did, in fact, wrongfully refuse to release these dogs to Plaintiff, this is precisely the type "unpredictable" conduct identified by the Supreme Court in *Parratt*. When MCAC refused to return these dogs, Plaintiff could have brought suit in state court demanding return of dogs she claims were wrongfully held. *See*, *Parratt*, 451 U.S. at 538. *See also, Copeland,* 57 F.3d at 479; *Victory*, 721 F.2d at 1064.

As to the one dog, Oscar, which Plaintiff claims was mistakenly determined to belong to Paws Angels, Plaintiff also has a remedy in state court. Plaintiff has not demonstrated that no state remedies are available. *See Huron Valley Hosp.*, 887 F.2d at 716 ("It is up to Plaintiff to demonstrate that there are no state remedies"); *Copeland*, 57 F.3d at 479 ("Plaintiff must plead and prove the state remedies for addressing the wrong are inadequate"). Therefore, Plaintiff has not established a due process claim as to the dogs surrendered to MCAC.

### 3. Constitutionality of the MCAC Regulations

Although not pleaded specifically in the Complaint, in her motion for summary judgment, Plaintiff appears to allege that the MCAC Regulations are facially unconstitutional because they do not provide a procedure for owners to contest the ownership determination or provide for a hearing before animals are released to the deemed owner.

As an initial matter, Plaintiff did not include this claim in the Amended Complaint and it is not properly raised at the summary judgment stage. *See Alomari v. Ohio Dept. of Public Safety*, 626 Fed. Appx. 558 (2015). Although she alleged general due process violations, those allegations centered around the search of her residence and the seizure of the dogs. Plaintiff also specifically argued, and the Court rejected, that the Tennessee state law allowing the animal control agency to petition the court for a security bond, Tenn. Code Ann. § 34-14-210, was unconstitutional. Not until filing her motion for summary judgment did Plaintiff raise the constitutionality of the MCAC regulations. For the sake of completeness, we consider the adequacy of process provided by the MCAC regulations.

The Regulations require only that MCAC notify the owner and release the animals upon payment of necessary fees. MCAC must hold unclaimed animals for 3-5 days before placing them for adoption. Montgomery County Animal Control Regulations (Doc. No. 158-6.)

The Court again applies the *Mathews* balancing test. *See United Pet Supply*, 768 F.3d at 486 (applying the *Mathews* balancing test to the seizure of animals). As stated above, the *Mathews* test considers: the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards, and the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335.

Plaintiff has a property interest in the dogs that she owns. The risk of an erroneous deprivation, of the sort that Plaintiff alleges here, is low. The animal control agency is charged with making reasonable attempts to determine and notify the owner. It does not appear to the Court there are an abundance of cases in which the animal control agency identifies an owner that is not the true owner and that the erroneously identified owner claims the animal leaving the true owner permanently deprived her property. Plaintiff suggests that additional safeguards, such as a hearing to determine ownership, are required to protect the due process rights of owners. Undoubtedly, this would lessen the risk of erroneous determinations of ownership. However, the Court must also consider the Government's interest, and the fiscal and administrative burdens the additional procedure would entail. Requiring a hearing before releasing animals to their owners would impose an enormous burden on the animal control agency or the courts; that burden is unwarranted given the value of the property in question and the low risk of erroneous deprivation. Additionally, holding a large number of animals pending an ownership determination hearing would burden the resources of the animal control agency tasked with caring for the pets.[16] The Court finds that due process does not require that the animal control agency hold hearings before

---

[16] Plaintiff alleges that Montgomery County Animal Control had an intake of almost 2000 dogs (not including cats and other animals) in a year. (Doc. No. 4 at ¶ 11.)

releasing animals to their owners, and the Montgomery County Animal Control Regulations are, therefore, not facially unconstitutional.

### 4. Adequate Procedural Rights to Contest the Security Bond

Plaintiff claims she was not afforded an adequate opportunity to contest the security bond set for the dogs. The Court finds this claim without merit. Plaintiff had two hearings addressing the security bond issue. At the first hearing the judge set the bond at $20,000. Upon appeal to the Circuit Court, the bond amount was reduced to $10,000. The judges considered not only the amount of the bond, but also the propriety of issuing a bond at all, and both judges concluded that a bond was justified. Plaintiff was not deprived of due process on this issue.

### C. Constitutional Right to Privacy

Plaintiff alleges an invasion of her constitutional right to privacy against Officer Matos, Officer Cook, and Director Farrell based on Officers Matos and Cook taking photographs of the interior of her home on August 8, and the alleged release of these photographs to others.

Plaintiff alleges that Officers Matos and Cook violated her constitutional right to privacy by taking photographs of the interior of her home and sharing them with others. (Doc. No. 45 at ¶ 171.) It is undisputed that photographs of her home were shared on social media and that one photograph was published in *ClarksvilleNow.com*, an online local news source.

The constitutional right to privacy is narrowly construed. Courts have found a constitutional right to privacy in the substantive due process protections of the Fourteenth Amendment. *See Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008). The Supreme Court recognizes two types of constitutional privacy interests. The first is the interest in "independence in making certain kinds of important decisions," which is not applicable to this case. The other

privacy interest applicable to individuals is the "interest in avoiding disclosure of personal matters," also known as the "informational right to privacy." *Id.*

The Sixth Circuit has narrowly construed the informational right to privacy to extend only to interests that implicate a fundamental liberty interest. *Id.* (citing *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir. 1998)). The Sixth Circuit has recognized only two instances of privacy interests of constitutional dimension: (1) where the release of information could lead to bodily harm, and (2) where the information released was of a sexual, personal, and humiliating nature. *Lambert*, 517 F.3d at 440.

Plaintiff has not claimed that the release of the photographs of her home could lead to bodily harm. Rather, she relied on the argument that the photos were sufficiently personal and humiliating as to rise to a constitutional dimension. The Sixth Circuit has not agreed that information that is merely personal and humiliating implicates the constitutional right to privacy. Rather the Sixth Circuit has reasoned that the principle emerging from *Bloch* follows an individual's right to be free from governmental intrusion into matters touching on sexuality and family life. An individual's privacy right in her sexual activities "follow[ed] from the cases holding that such basic matters as contraception, abortion, marriage, and family life are protected by the constitution from unwarranted government intrusion." *Id.* citing *Bloch* 156 F.3d 685.

Plaintiff cites *U.S. v. Thomas*, 745 F.Supp. 499, 502 (M.D. Tenn. 1990) in support of her position that the Sixth Circuit recognizes a constitutional right to keep photographs of one's home confidential. (Doc. No. 170 at 16.) In *Thomas*, the court considered a First Amendment request to inspect judicial records, which is within the discretion of the trial court to grant or deny, not whether the video implicated an informational right to privacy under the Constitution. *Thomas*, 745 F.Supp. at 501. Deciding whether to release the videotape, the court was required to balance

the interests of the parties, the public, and the duties of the court. The judge noted that the video, which was a recording of the execution of a search warrant, showed parts of the home that were not subject to the warrant, and that the informational value of the video to the public was low because of its poor quality and because the details of the search were available in other documents to which the media had access. The court also considered that dissemination might affect one of the defendant's right to a fair trial. At no point did the court find that the defendant had a constitutional privacy right to video of the interior of his home such that disclosure of the video would violate the defendant's substantive due process rights.

There is nothing remotely "sexual, personal, and humiliating" in the photographs of the interior of plaintiff's house, and Plaintiff has cited no cases in the Sixth Circuit, or elsewhere, where a court has found a violation of a constitutional right to privacy based on the dissemination of photographs of the private areas of someone's home. The allegations and evidence presented do not state a constitutional claim for invasion of privacy. Even if the photographs would otherwise implicate Plaintiff's constitutional right to privacy, the right to privacy does not extend to evidence in a criminal prosecution. *See Cawood v. Haggard*, 327 F.Supp. 2d 863, 880 (E.D. Tenn. 2004) (finding no constitutional right to privacy violated in the release of a sexual video tape that was evidence in a criminal prosecution because "suspected criminal acts do not carry with them a corresponding right to confidentiality" and "the videotape was destined to become public in as much as it was evidence to be used, and was in fact used in the criminal investigation.")

To the extent Plaintiff claims an invasion of privacy because Matos and Cook entered her house and took photos, the Court has already concluded that Officers Matos and Cook were inside the house lawfully and that they had probable cause to believe a crime was being committed. Any

claims related to their entry into the house and taking photographs for their investigation are without merit.

In her responses to the various motions for summary judgment, Plaintiff also raises a new theory of liability as to her right to privacy, a theory not properly before the Court because it was not included in the Amended Complaint. *See Tucker v. Union of Needletrades, Indus., & Textile Emps*., 407 F.3d 784 (6th Cir. 2005) (declining to consider new theories of liability raised for the first time in response to a motion for summary judgment). Specifically, Plaintiff claims that Officers Matos and Cook are liable for invasion of privacy because they authorized Carolyn Will and Trisha Davids to enter the house. Although the Court need not consider these new, unpleaded theories of liability, the claim is without merit. Plaintiff asked Trisha Davids to go to her house to check on the dogs and gave her a key to the house. Trisha Davids, and possibly Plaintiff, asked Carolyn Will to check on the dogs and told her how to access the house. Moreover, Carolyn Will was in the house *before* the police arrived. There is no evidence that Officers Matos and Cook invited Will or Davids into the home, only perhaps an inference that the officers did not make them leave.

The cases cited by Plaintiff in support of this new theory involve instances of the police expressly inviting a third party, usually a news crew, into the crime scene, and are inapplicable here. *See Barrett v. Outlet Broadcasting, Inc*., 22 F. Supp. 2d 726 (S.D. Ohio 1997) (claim allowed to proceed where news crew was invited into the decedent's home by police and was alleged to have disturbed the corpse and items in her bedroom in order to portray her in a false light); *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992) (law enforcement allowing a private security guard to accompany them during the execution of a search warrant so the security guard could search for evidence related to a private legal action was an unreasonable search); *Buoncore v. Harris*, 65 F.3d

347 (4th Cir. 1995) (finding a search unreasonable when, while executing a search warrant for guns, officers allowed a third-party to enter the home and identify property belonging his employer).

For these reasons, Plaintiff has not stated a claim against any defendant for constitutional invasion of privacy.

### D. Qualified Immunity

Defendants Officer Matos, Officer Cook, and Director Farrell assert that they are shielded from liability by the doctrine of qualified immunity. Government officials performing discretionary functions are afforded a qualified immunity under 42 U.S.C. § 1983 as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This creates a two-part test: (1) whether the plaintiff has shown the violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Id*.

As decided in the previous sections, Plaintiff has not shown that her constitutional rights were violated. Accordingly, the defense of qualified immunity does not apply.

### E. Liability of Montgomery County

A county is liable under § 1983 only if it "had an official policy, custom, or practice … that deprived the plaintiff of [her] federal rights." *Fields v. Henry County*, 701 F.3d 180, 183 (6th Cir. 2012). The plaintiff "must identify the policy, connect the policy to the [municipal actor], and show that the particular injury was incurred because of the execution of that policy." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 777 (6th Cir. 2012). The County cannot be liable for acts of its employees that were not found to violate Plaintiff's constitutional rights. *See Wilson v.*

*Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act.")

Montgomery County claims that Plaintiff did not plead facts to show that Montgomery County had a policy that resulted in a violation of her constitutional rights. The Amended Complaint alleges the existence of an "unwritten policy" of the County "to aggressively enforce its regulations by seizing and impounding dogs" (Doc. No. 26 at ¶ 13). Plaintiff alleges that the County has a policy of encouraging "officers employed in Animal Control division to seize animals on suspicious grounds, institute proceedings against the owners for alleged acts of animal cruelty, and sequester said animals until proceedings are resolved and its owner has paid the cost of care and maintenance of said animals pending the disposition of the criminal proceedings." (*Id.* at ¶ 178.) Plaintiff also makes allegations related to policies surrounding the security bond. (*Id.* at ¶ 179-180.) She appears to allege that Montgomery County has a policy of impounding dogs based on alleged acts of animal cruelty so that it can petition the court for a security bond to care for the dogs and that the County does this because it can use the money from the security bond "regardless of whether the owner is found guilty." (*Id.*)

Plaintiff has not provided any evidence of these "unwritten policies." Nor does Plaintiff have any claim for the events regarding the security bond process or any claim the forfeiture of her dogs when she failed to pay the court-ordered security bond.[17]

The only actual policy for which there is evidence is the policy contained in the Montgomery County Animal Control Regulations. Plaintiff did not allege any facts related to this policy in the Amended Complaint and cannot do so for the first time on a motion for summary

---

[17] Notably, this Court has already dismissed Plaintiff's challenge to the constitutionality of the Tennessee statute allowing the security bond, T.C.A. § 34-14-210(g). *See* Doc. No. 116 (Court Order dismissing Count 6).

judgment.  *See Alomari*, 626 Fed. Appx. 558 (2015) ("Generally, a plaintiff cannot raise a claim for the first time at the summary judgment stage."); s*ee also*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373-74 (6th Cir. 2011) (Plaintiffs' claims dismissed where they failed to allege the existence of the policy pursuant to which they allege constitutional violations.)

Because Plaintiff has failed to identify an official policy that resulted in any constitutional violations, she has no claims against Montgomery County, Tennessee.

## IV.   CONCLUSION

For the reasons stated, Plaintiff's Motion for Summary Judgment is DENIED. Montgomery County, Tennessee's Motion for Summary Judgment is GRANTED.  John Matos's Motion for Summary Judgment is GRANTED.  Jessica Cook's Motion for Summary Judgment is GRANTED.  Plaintiff's claims against Jessica Cook are DISMISSED.   Jeannette Farrell's Motion for Summary Judgment is GRANTED.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE